STATE v. BARNES

[110 N.C. App. 473 (1993)]

STATE OF NORTH CAROLINA v. RAYMOND LOUIS BARNES

No. 929SC367

(Filed 1 June 1993)

## Kidnapping and Felonious Restraint § 21 (NCI4th)— kidnapping— purpose of terrorizing victim—evidence sufficient

There was sufficient evidence in a kidnapping prosecution that defendant confined or restrained the victim for the purpose of terrorizing him where the victim broke into the house of defendant's son and stole items which he sold to support a drug habit; defendant and his accomplices subsequently accosted the victim in the parking lot of a Golden Corral; they were all armed except the victim; defendant carried a pump shotgun; the victim was searched; defendant smashed the shotgun against the victim's head; the victim broke free and ran; he was subsequently accosted by defendant and his accomplices at the victim's apartment; as defendant and one accomplice were pushing on the front door, the victim opened it quickly, so that defendant and his accomplice fell into the apartment; the victim escaped with defendant's accomplices in pursuit and threatening to shoot him; he was caught, held at bay with a gun, and ordered to get into a limousine; defendant was waiting in the limousine with a pump shotgun and told the victim he was taking him to Durham to retrieve the items stolen from his son; the limousine was stopped at a roadblock by law enforcement officials; the victim emerged scared, shaking, nervous, and crying; and the victim told officers that defendant was trying to kill him, that defendant had forced him to go with defendant by using a pistol, and that he was still in fear of his life. There was sufficient evidence to show that defendant intended to and did put the victim in an intense state of fright or apprehension when the victim was placed in the limousine and confined there so that he would agree to retrieve the stolen items.

### Am Jur 2d, Abduction and Kidnapping § 32.

Appeal by defendant from judgment entered 12 December 1991 by Judge George M. Fountain in Person County Superior Court. Heard in the Court of Appeals 1 April 1993.

STATE v. BARNES

[110 N.C. App. 473 (1993)]

*Attorney General Lacy H. Thornburg, by Assistant Attorney General Thomas G. Meacham, Jr., for State.*

*H. M. Michaux, Jr., for defendant.*

JOHNSON, Judge.

The facts in this case are as follows: Rodney Burnette broke into the house of the defendant's son on Saturday morning, 1 December 1990, stole some items and then sold those items to support a drug habit. That night, while Rodney was in his car in the Golden Corral parking lot, defendant, armed with a shotgun, and his accomplices, who were also armed, stopped Rodney's car. They made Rodney exit the car and after searching him, defendant struck him in the head with a pump shotgun. Rodney escaped and ran to a friend's house. The friend's father, Joseph Bennett, transported Rodney to the hospital where he was treated for a head injury resulting from the blow to his head. Although the police were called, Rodney was afraid to press charges or to return immediately to his apartment. He eventually returned home at about 5:00 a.m. Sunday morning. Later that day, defendant and his accomplices arrived at Rodney's apartment in a white limousine. As they exited the limousine, Rodney saw that defendant had a pistol. Defendant and one accomplice came to the front door, another accomplice went to the back door, and one remained at the limousine. Defendant and the accomplice at the front door began pushing on the door to force it open. As they pushed against the door, Rodney snatched the door open, causing the two to fall to the floor inside the apartment. Rodney ran from the apartment with defendant's accomplices in pursuit. The accomplices were threatening to shoot as they chased him. They out ran Rodney and tackled him. While holding a gun on him, they ordered him to get into the limousine which had then driven up to where they were. Defendant was seated in the limousine with a pump shotgun on the floorboard. Defendant accused Rodney of breaking into his son's home and said that he was taking Rodney to Durham to make him find the stolen property. After riding for about twenty minutes, the limousine came upon a roadblock set up by the police. Rodney exited the limousine and related to Officer Poole, one of the law enforcement officials at the roadblock, the events that had transpired. Rodney's statement was later reduced to writing which he signed after reading it.

Donnell Bennett, Joseph Bennett and Danny Eastwood testified for the State and corroborated various aspects of Rodney's testimony.

The defendant contends that the trial court erred in failing to allow his motion to dismiss at the close of all of the evidence because the State failed to establish the crime of kidnapping with the intent to terrorize. We find this argument meritless.

In passing upon a motion to dismiss made pursuant to North Carolina General Statutes § 15A-1227 (1988), all of the evidence admitted, whether competent or incompetent, is viewed in the light most favorable to the State, and the State is entitled to every reasonable inference therefrom. *State v. Earnhardt*, 307 N.C. 62, 296 S.E.2d 649 (1982). Contradictions and discrepancies do not warrant dismissal of the charges for they are for the jury to resolve. *Id.* The question for the trial court is whether the State has offered substantial evidence of defendant's guilt on every essential element of the crime charged. *State v. Corbett and State v. Rhone*, 307 N.C. 169, 297 S.E.2d 553 (1982). If so, the motion is denied. *Id.*

In order to sustain a conviction for kidnapping the State must prove that "the defendant unlawfully confined, restrained or removed the person for one of the eight purposes set out in the statute." *State v. Moore*, 315 N.C. 738, 743, 340 S.E.2d 401, 404 (1986). In the present case, the purpose set out in the indictment was terrorizing. The trial court, in conformity with the indictment, submitted the offense of kidnapping to the jury on the theory that the defendant had unlawfully confined, restrained or removed Rodney Burnette for the purpose of terrorizing him. In *Moore*, the Court indicated that terrorizing was defined as "more than just putting another in fear. It means putting that person in some high degree of fear, a state of intense fright or apprehension." *Id.* at 744, 340 S.E.2d at 405.

In the case *sub judice*, the State's witness, Rodney, testified that defendant and his accomplices accosted him in the parking lot of the Golden Corral. They were all armed except Rodney. Defendant personally carried a pump shotgun. After Rodney had been searched, defendant took the pump shotgun and smashed it against Rodney's head. Rodney broke free and ran to escape defendant and his accomplices. He ran to a place called Ely's Club where he caught a ride to his friend Donnell Bennett's house. Donnell's father, Mr. Joseph Bennett, took Rodney to the hospital to receive treatment for the head wound.

Mr. Donnell Bennett testified that he saw three or four men pull up at Golden Corral, confront Rodney and then hit him in the head before Rodney escaped. Mr. Joseph Bennett testified that he took Rodney to the hospital for treatment of the head wound.

After the first incident at the Golden Corral, the State's evidence showed that Rodney was again accosted by the defendant and his accomplices. Rodney signed a written statement relating the details of that incident. The defendant and his accomplices drove to Rodney's apartment on 2 December 1990 in a white limousine. Rodney noticed that the defendant had a pistol. When defendant and one of his accomplices were pushing against the front door to force it open, Rodney opened the apartment door quickly causing the defendant and his accomplice to fall into the apartment. Rodney escaped from the apartment with defendant's accomplices in pursuit and threatening to shoot him. Rodney was caught and while held at bay with a gun was ordered to get into the limousine. The defendant was waiting in the limousine with a pump shotgun. The defendant accused Rodney of stealing some items from his son and told Rodney he was taking him to Durham to retrieve the property.

Danny Eastwood further corroborated Rodney's version of the incident. He stated that he saw two black males chasing a third black male across a nearby field early Sunday afternoon. When they caught him, they started to beat him at which time Danny called 911. He then saw a white limousine leave the area and he did not see the black males anymore.

In addition, the State's evidence showed that the limousine was stopped at a roadblock by law enforcement officials. Rodney was scared, shaking, nervous, and crying when he exited the vehicle. Rodney told an officer at the roadblock, Officer Poole, that he had stolen some items from defendant's son and that defendant was trying to kill him. He also told Officer Poole that, "I did not want to go with Raymond [defendant] but he 'forced me to go against my will by using a pistol to threaten me. I am still—I am still in fear of my life because Raymond Barnes [defendant] has people working for him that would do anything he tells them to do. I think they're going to kill me."

Defendant contends that the evidence presented was suspicion and conjecture. Defendant also contends that the fear shown by Rodney at the roadblock was due to the show of weaponry by

the law enforcement officials. In fact, defendant contends that at no time was Rodney "in an intense state of fright or apprehension." Lastly, defendant contends that Rodney admitted at trial that the statement he gave Officer Poole was in part untrue, and therefore, the evidence was manifestly insufficient to establish the intent of the defendant. Defendant calls particular attention to the examination by the district attorney when he was questioning the prosecuting witness about the accuracy of his statement.

Q. All right, Is there anything else on page two that's not correct.

A. The part about he said he was taking me to Durham and make me find the stolen items.

Q. What is not accurate about that?

A. He did not say he was going to make me find the stolen items.

Q. What did he say?

A. He asked me would I sign a statement saying I was going to take him to Durham to help him get the items back.

Considering the evidence in the light most favorable to the State, resolving all contradictions and inconsistencies in the State's favor, we find the State presented sufficient evidence to show that the defendant intended to and in fact did put the victim in an intense state of fright or apprehension when they placed the victim in the limousine and confined him there so that he would agree to retrieve the stolen items. There was sufficient evidence to take the case to the jury.

We find no error.

Judges ORR and McCRODDEN concur.